**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-21773-CIV-MORENO/GOODMAN**

GUSTAVO PEREZ,

     Plaintiff,

v.

FLORIDA BEAUTY FLORA, INC., et al.,

     Defendants.

_____/

**REPORT AND RECOMMENDATIONS ON**
**DEFENDANTS' SUMMARY JUDGMENT MOTION**

Plaintiff Gustavo Perez filed a Fair Labor Standards Act lawsuit against his former employer, Florida Beauty Flora, Inc. ("FBF"), and two of its principals (Ronen Koubi and Ralph Milman), alleging that FBF did not properly pay him overtime wages. [ECF No. 1]. Defendants filed a summary judgment motion [ECF No. 25], contending that Perez is exempt from the FLSA's overtime provision because of three exemptions: the executive exemption, the administrative exemption, and the highly compensated employee exemption. Perez filed an opposition response [ECF No. 68] and FBF filed an optional reply [ECF No. 72].

What FBF did *not* do, however, is file a required, separately served Reply Statement of Material Facts. Thus, it did not properly interpose challenges to the

additional facts (paragraphs 54 through 108) which Perez contends are undisputed in his "Additional Facts" section. [ECF No. 64, pp. 7-16]. Because Perez's additional facts contain evidentiary support (such as declarations),[1] the Court accepts his additional facts as sufficient to generate a genuine dispute over the material facts which FBF says are undisputed in its summary judgment motion presentation.

United States District Judge Federico A. Moreno referred [ECF No. 37] Defendants' summary judgment motion to the Undersigned for a Report and Recommendations.

For reasons outlined in greater detail below, the Undersigned **respectfully recommends** that Judge Moreno **deny** Defendants' summary judgment motion. At bottom, there is a substantial factual dispute about whether Perez meets all the elements necessary to be properly classified as exempt under any of the three claimed exemptions. Although FBF and the other two Defendants would be entitled to summary judgment if they demonstrated an absence of genuine material fact on even one of the exemptions, they have not accomplished that goal.

Perez concedes that he was a highly compensated employee (because he was paid more than $107,432 per year), but there is a dispute over the other required element -- i.e., that he regularly performed any of the exempt duties or responsibilities of an executive or administrative employee.

---

[1] 28 U.S.C. § 1746 provides that an unsworn declaration in substantially the form designated in the statute has "like force and effect" of an affidavit. The language used in the Perez-submitted declarations are in the designated form.

2

And there are disputes over other required elements for the other exemptions. For example, there is a dispute over FBF's contention that Perez's primary duty was management or general business operations, issues relevant to the administrative exemption. Likewise, there is a dispute over Perez's exercise of discretion and independent judgment concerning significant matters -- other factors relevant to the administrative exemption. There are also disputes about Perez's authority to hire or fire other employees and whether his suggestions were given particular weight, which are issues for the executive exemption. And, given these disputes, there are consequently disputes over the highly compensated employee exemption, which involves the duties or responsibilities described above.

In its reply memorandum, FBF, in attorney rhetoric, argues that Perez's presentation is conclusory and inconsistent with certain documents, such as emails. But FBF did not comply with the straightforward procedural directive that it respond to Perez's additional facts on a paragraph-by-paragraph basis.

It is not the Court's job to scan through the record and determine which of Perez's purported undisputed facts are actually disputed and to conduct a pinpoint search for the evidentiary support for that determination. That task is a time-consuming one which would require comprehensive familiarity with the nuances of the factual record. That is why, in part, Local Rule 56.1(b)(3) requires the initial movant (such as FBF) to serve a separate Reply Statement of Material Facts if an opponent (such as Perez) serves a

Statement of Material Facts which includes additional facts (like Perez did in his submission).

Given the existence of factual disputes, many of which were caused by FBF's failure to specifically identify as disputed or undisputed Perez's Additional Facts, a jury will therefore need to determine the viability of the claimed exemptions if this case is not otherwise resolved.

## I.   <u>The Local Rule and Its Straightforward Requirements</u>

For purposes of explaining the fundamental gap in FBF's submissions, the Undersigned will summarize the relevant components of Local Rule 56.1. The provisions which FBF failed to follow were part of an amendment effective December 2, 2019, more than fifteen (15) months before FBF served an optional reply memorandum (but failed to serve the required Reply Statement of Material Facts).

First, there is a Statement of Material Facts. Both the Movant and the Opponent must file one. The Movant files the initial one. The format is separately numbered paragraphs. The Movant lists those material facts which the Movant deems undisputed. The Opponent then must file a Statement of Material Facts. The format is unambiguous: the very first word in each paragraph-by-paragraph response must be "disputed" or "undisputed." If the Opponent contends that a purported undisputed fact is actually disputed, then the Opponent must provide evidentiary citations.

The local rule also gives the Opponent the ability to provide *additional* facts which

the Opponent deems to be undisputed (and which the Opponent views as support for an Order denying the Movant's summary judgment motion). If the Opponent takes advantage of this opportunity, then the original Movant **must** file a Reply Statement of Material Facts. That Reply Statement of Material Facts must also use a paragraph-by-paragraph form, and it must use "disputed" or "undisputed" as the very first word. And in the event that the initial Movant contends that a purportedly undisputed additional fact is actually disputed, then the Movant must provide evidentiary citations.

## II.   Undisputed[2] Factual Background and Procedural History

### A.  Facts Highlighted By FBF[3]

---

[2]   The facts here are generated from the paragraphs in each side's Statement of Facts which the opposing party agreed are undisputed. As highlighted above, and as further explained in this history, FBF never submitted the required Reply Statement of Material Facts, and it therefore did not agree or disagree with Perez's contention that his additional facts are undisputed.

Therefore, the disputed facts, from a technical and procedural perspective, are only those flagged as disputed by Perez. For those purported facts which Perez classified as *partly* disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by the parties. The abbreviation, "N/A," means that the paragraph proffered by FBF as undisputed is treated as **disputed.** The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the initial source document if needed.

[3]   FBF filed its separate Statement of Facts twice. [ECF Nos. 44; 45]. There does not appear to be any difference between them, and the Undersigned assumes that FBF inadvertently filed the same document twice.

1.     This case is a dispute about Plaintiff's allegation that Defendants violated the Fair Labor Standards Act.

2.     Defendant FBF is a Florida Profit Corporation that employed Plaintiff.

3.     FBF is covered by the FLSA.

4.     Defendants are engaged in the movement of goods in commerce.

5.     FBF is an employer under the FLSA and employed Perez until February 14, 2020.

6.     Plaintiff Perez worked in the Sales Department of FBF.

7.     At relevant times alleged in the lawsuit, Defendants Koubi and Milman were officers of FBF.

8.     FBF is a transportation, logistics, and warehouse distribution company providing services throughout the United States.

9.     On or about May 13, 2020, Plaintiff filed its Statement of Claim.

10.    In his Statement of Claim, Plaintiff defines the relevant time period as April 28, 2017 to April 28, 2020.

11.    In 2017, Plaintiff was paid a salary of $110,000.02.

12.    In 2017, Plaintiff was paid a salary of $2,115.38 per week.

13.    In 2018, Plaintiff was paid a salary of $121,583.47.

14.    In 2018, Plaintiff was paid a salary of $2,337.25 per week.

15.    In 2019, the Plaintiff was paid a salary of $125,175.

6

16.     Plaintiff received a $5,000 bonus in 2019.

17.     In 2019, Plaintiff received weekly salary compensation of $2,407.21.

18.     Plaintiff worked six weeks in the calendar year 2020.

19.     Plaintiff was paid $20,000 in 2020, receiving $3,333.33 per week of work.

20.     At all times during the Relevant Time Period the Plaintiff was compensated by a salary that exceeded $684 per week.

21.     At all times during the Relevant Time Period the annual compensation of Plaintiff exceeded $107,432 per annum.

22.     Plaintiff was the manager of the floral department within FBF's sales department during the entire relevant time period.[4]

23.     Sales is a customarily recognized department at FBF. However, Perez implicitly contends that this is misleading because: (1) the Floral Department where he worked was a subgroup of the sales department; (2) Perez was the only employee who worked in the floral department; and (3) it is incorrect to equate the two departments.

24.     Throughout the relevant time period and through the present, the floral department is critical to FBF's business. However, Perez asserts as disputed the point that the department was staffed by anyone other than him.

---

[4]     Perez's response to numbered paragraph 22 of FBF's Statement of Material Facts is one word: "Disputed." He did not provide any evidentiary support for this position, as required by the local rule. The Undersigned therefore deems this paragraph to be *undisputed.*

25.     During the relevant time period, Plaintiff was the highest paid employee in the floral department. [But Perez points out that he was the *only* employee in the department, which means that he was also the *lowest* paid employee there].

26.     In his LinkedIn profile, Perez holds himself out to the public as a manager at FBF. [Perez argues that this is irrelevant because the title he gave himself on his profile will not prove or disprove his status as an exempt employee].

27.     N/A

28.     N/A

29.     N/A

30.     Plaintiff reported directly to Mr. Koubi, President of FBF, or Mr. Milman, a high-ranking officer of FBF. [But Perez contends that he worked directly beside Effie Kaplan, who is married to Ralph Milman. In addition, he notes that he also reported to Ari Afek, who is Ms. Kaplan's son, and the director of FBF's Human Resources Department].

31.     N/A

32.     N/A

33.     N/A

34.     N/A

35.     N/A

36.     N/A

8

37.     N/A

38.     N/A

39.     Although Perez drafted work schedules, those schedules had to be approved by Ralph Milman or Ari Afek.

40.     N/A

41.     N/A

42.     N/A

43.     At all times, Plaintiff knew and recognized that his duties greatly exceeded those of other sales personnel.[5]

44.     N/A

45.     N/A

46.     Plaintiff regularly reported employee grievances and safety concerns.

47.     N/A

48.     Perez had a little discretion for setting prices.

49.     When Plaintiff negotiated a rate for client satisfaction, the President of FBF rarely disputed a rate Plaintiff offered because Plaintiff was required by FBF policy to not set a rate lower than $2.00/cube.

---

[5]     Plaintiff did not designate this paragraph as "undisputed" or "disputed." Instead, he interposed an "Objection." The Undersigned therefore considers part of this paragraph to be undisputed (but I omitted the portion where Perez otherwise in his response provided a correct and required response and supported it with an evidentiary citation).

50.    N/A

51.    If Perez set a price inside of the so-called "spread," then he would provide the rates to Ari Afek, Director of Human Resources, who had the authority to input the rates into the computer systems.

52.    By Plaintiff's own words in an internal email to a new employee, Perez introduced himself and represented that his "duties include managing flower department, claims, sales and accounting." [Perez contends that this statement is irrelevant because it does not establish or undermine his status as a purportedly exempt employee].

53.    N/A

**B.  Facts Highlighted by Perez**

In its Statement of Material Facts [ECF No. 44], FBF asserted 53 separately numbered paragraphs of supposedly undisputed facts. With two or three exceptions, Perez responded to each paragraph in the procedurally required format (i.e., beginning each response with "disputed" or "undisputed" and providing evidentiary support for each numbered paragraph designated as undisputed).

In his Statement of Material Facts [ECF No. 64], Perez also listed *additional* facts and represented that they are undisputed. Indeed, the title of his submission is "Plaintiff's Response to Defendant's Material Facts **and Plaintiff's** *Additional* **Facts.**" (emphasis added). Specifically, Perez asserted 55 additional paragraphs of supposedly undisputed

facts (paragraph numbers 54-108). So Perez asserted more purportedly undisputed facts than FBF proffered as part of its summary judgment motion package.

In any event, regardless of whether Perez raised more, less or the same number of allegedly undisputed facts than FBF, the significant point is that FBF never filed a Reply Statement of Material Facts -- and therefore never explained *which* of those 55 additional paragraphs of purportedly undisputed facts were disputed, why they were disputed, and the precise evidence in the record which confirmed FBF's position.

To be sure, it is obvious that FBF does take the position that Perez's Additional Facts are, as a *general* matter, disputed and unreliable. But it does so in a sweeping, conclusory way, without complying with the local rule. For example, its reply memorandum argues that "Plaintiff only relies on uncorroborated, conclusory declarations that are contradicted by the record evidence." [ECF No. 72, p. 2]. But that is a far cry from submitting a paragraph-by-paragraph presentation, with each paragraph unequivocally classifying an additional fact as "disputed" or "undisputed."

At times, FBF's reply memorandum quotes evidence to support its position. But it does not refer back to Perez's Additional Facts, so that the reader can quickly and easily discern *which* paragraph is being challenged by FBF as undisputed. As noted earlier, it is not a court's job to scour a memorandum to figure out which numbered paragraph from the Additional Facts is being discussed, nor is it a judge's job to infer which paragraphs are being challenged through broad rhetoric. Similarly, arguing that certain

representations (without specifying which ones they are) are "contradicted by the record evidence" [ECF No. 72, p. 2] is unhelpful.

From FBF's optional reply memorandum, it is obvious that it disagrees with some of Perez's additional facts and therefore would most likely have classified those paragraphs as disputed. But the Undersigned does not know if FBF would brand as disputed some, many, most, or all of Perez's additional facts. And I certainly would not know *which* particular paragraphs are being challenged as disputed by FBF, nor would I know the specific record evidence which FBF is relying upon to justify its position that a fact labeled by Perez as undisputed is actually disputed, or why.

The Eleventh Circuit has joined several other federal appellate courts in noting that judges "are not like pigs, hunting for truffles buried in briefs" and pointing out that "district court judges are not required to ferret out delectable facts buried in a massive record." *A.L. v. Jackson Cnty. School Bd.*, 635 F. App'x 774, 786-87 (11th Cir. 2015); *see also Berkower v. USAA Cas. Ins. Co.*, No. 15-23947-CIV, 2017 WL 1250419, at *3 (S.D. Fla. Apr. 4, 2017) ("A barebones, conclusory statement that an undisputed fact is 'disputed' does not make it so, which is why the local rules requires evidentiary record citations.").

Moreover, our appellate court has highlighted the burdens arising from a party's failure to bring specific facts to the court's attention. Specifically, the Eleventh Circuit has succinctly explained that "making district courts dig through volumes of documents and transcripts would shift the burden of sifting from [litigants] to the courts," a scenario

which is unworkable because "with a heavy caseload and always limited resources, a district court cannot be expected to do a [litigant's] work for him." *Chavez v. Sec'y Florida Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011); *see also Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997) ("[W]e are not obligated to cull the record ourselves in search of facts not included in the statement of fact"); *cf. Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 750 F. Supp. 1346, 1361 (S.D. Fla. 2010) (Moreno, J., affirming and adopting a Report and Recommendation which explained that "it is not the Court's role to guess as to whether this key fact [is] necessary" for a summary judgment issue).[6]

Local Rule 56.1(c) provides the consequences for failure to properly controvert undisputed facts: "All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply."

The Undersigned will now (using Perez's paragraph-numbering format) list[7] all of Perez's additional facts, which, because FBF did not serve a Reply Statement of Material Facts, are, for purposes of this motion, being treated as undisputed.

---

[6]     The Report and Recommendations approved by Judge Moreno also cited *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (internal quotation marks omitted) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.").

[7]     Similar to the procedure used for listing FBF's undisputed facts, the Undersigned is removing the specific record citations.

13

C.     **Additional Facts**

54.     While his title at FBF was Sales Manager, Perez was a "manager" only by title, and his primary duty was sales. He was the only salesperson whose job it was to sell shipping space (the unit of measure is called a "cube") to businesses that shipped flowers. His sales accounted for approximately 60% of the sales of FBF and required approximately 80-90 hours per week of work.

55.     Perez was normally paid based upon an 80-hour work week, and he was asked to clock-in and clock-out each day.

56.     He was not in charge of marketing or negotiating contracts for advertising. That was the responsibility of Ari Afek.

57.     Perez was not in charge of dispatching. That was the responsibility of Gus Duarte.

58.     During the relevant time period, Perez had a very narrow price range that he had permission to sell cubes.

59.     Perez was instructed by Ralph Milman that he was not allowed to sell a cube lower than the set amount without permission from management (e.g., "Can we move them down to [X]?").

60.     By forcing Perez to ask to have the price input into the computer system, Management ensured the rate that was set per cube was not outside of the range set by

management. Perez was not allowed to input the cube rate without asking Mr. Afek to set it in the computer.

61.     An example of Perez not being allowed to set a price below the "set amount" per cube and having to ask permission from management is the two emails that he sent to Effie Kaplan, Ari Afek, Ralph Milman, and Ronen Koubi on January 7, 2020 and January 14, 2020. In the emails, Perez stated that he needed a rate for a new customer below of $[X]. He did not have the authority to set the rate. Perez needed express permission from management, and he was not allowed to put the rate into the computer system.

62.     FBF uses the term "floral department," and Perez assumes this is to make it seem as though there are numerous employees that work in that "department." However, Perez was the only employee of the "floral department" and his primary job (approximately 99% of his time) was to sell floral cubes during the relevant time period.

63.     FBF uses the term "sales department." There was a "sales department," but Perez was not in charge of the employees who worked in sales because all of the other sales employees did not sell floral cubes.

64.     Part of Perez's duties included sales, accounting (calling customers to collect invoices, collecting information regarding incorrect invoices), customer service, claims (collecting information and passing on the claims forms), dispatching (communicating with drivers to help them locate customer's locations and the warehouse

regarding shipments), produce (helping with sales and clients), marketing (he was contacted several times by outside firms and passed the contact on to Ari Afek, Ralph Milman, or Ronen Koubi),

65.     The other individuals that Perez worked with in the "sales department" were customer support persons, not salespersons.

66.     While the customer support persons were his colleagues, Perez did not supervise their work and he did not hire or fire any of them. Although Perez may have been occasionally asked his opinion regarding their performance, he was not consulted when or if they were given raises, disciplined, or were granted days off.

67.     Perez was not in charge of the customer support persons. Their direct supervisor was Effie Kaplan.

68.     Perez would typically start his day at 5:00 am. His primary duty was to sell shipping space and to handle issues regarding complaints from FBF customers. He would typically spend the vast majority of his time selling and handling customer issues. If there was an issue regarding a customer's shipment, then he was required to report the issue to Ralph Milman, Ronin Koubi, Effie Kaplan, and Ari Afek. He would sometimes suggest how the problem could be fixed, but the final decision was made by Mr. Milman, Mr. Koubi, Ms. Kaplan, or Mr. Afek.

69.     While employed at FBF, Perez's primary duty was not "management or general business operations," it was sales and customer service. His sales usually made up 60% of the total sales of FBF.

70.     While Perez was an employee at FBF, he did not set management policies or policies for the general business operations; he merely followed the polices set by management. The polices at FBF for management and general business operations were set by Ari Afek, Ronen Koubi, Ralph Milman, and Effie Kaplan. Mr. Koubi, Mr. Milman, and Ms. Kaplan were all owners of FBF and they were all very hands-on when it came to management of the company. All the owners were present at the company and worked at least five days a week and frequently more.

71.     In fact, Perez was a "manager" only by title and any requests that he had for the customer service department needed to be approved/granted by Ari Afek (Manger of Human Resources), Ralph Milman (Owner), or Ronen Koubi (Owner). Such requests would include hiring of more employees to work in the sales department, decisions regarding who was going to be hired, increases in pay for employees, disciplining employees, approving timecards, allowing paid and non-paid time off.

72.     Perez was instructed to write schedules for employees who worked with him in the sales department (customer support persons). He had very little or no discretion on the number of hours each employee was scheduled to work or the days of

the weeks that they would work. The final word in approving the schedule(s) was from Ari Afek or Ralph Milman.

73.     Perez's duties did not include the hiring, disciplining, docking of pay, firing, creating schedules, approving timecards, overriding lunch break requirements, approving paid and non-paid time off, or pay increases for FBF, as stated by Defendants.

74.     The hiring, disciplining, docking of pay, firing, creating schedules, approving timecards, overriding lunch breaks, approving paid and non-paid time off, and pay increases, were not subjects that Perez was consulted about on a regular basis, and these were not part of his job responsibilities.

75.     Perez did not manage the "Claims, Dispatching, Produce and Marketing aspects of the floral department." These responsibilities were handled by Ralph Milman, Ronen Koubi, and Effie Kaplan. While Perez did have frequent customer contact and his primary job was to sell space on FBF trucks, he did not have the authority as a manager nor did he manage the "Claims, Dispatching, Produce and Marketing aspects of the floral department," as FBF stated.

76.     Because he had been assigned the duty of writing the schedules for the sales/customer service department, which were then reviewed by Ralph Milman or Ari Afek, it was important that Perez was aware of the days that employees had been approved for days off. He signed "Leave of Absence Request" forms to let management know that he was aware of the requested days off the employee want to take. Perez did

not have the authority to approve or disapprove a "Leave of Absence Request." The decision to approve or disapprove the request was made by Ari Afek, Ralph Milman, or Effie Kaplan.

77.     Perez remembers a specific incident/problem that occurred in December 2019 regarding staffing, overtime, and the warehouse. FBF had not hired enough warehouse staff to properly fill the schedule. He had alerted management to issues that he had seen due to shipping problems that he learned about through his customers. Because Perez was not allowed to hire new employees, the problems continued. FBF was cutting the hours of the current warehouse employees due to concerns regarding overtime and not hiring new employees due to labor costs. Even though Perez was directed to write the employee schedules for the customer service employees, he was not writing any schedules for the warehouse employees, as FBF claims he was doing. The hiring of employees and the warehouse schedules were the responsibility of Ari Afek or whomever he assigned those duties to. If Perez had been allowed to hire employees and the discretion to set schedules, then he would have kept the staff levels where the company needed them to be or scheduled more employees to work (even overtime) so as to keep up with the workload.

78.     Perez remembers another issue regarding staffing for the warehouse in January 2020. Yanela Rodriguez was responsible for writing the warehouse schedule and Ari Afek would approve it. There were issues with not enough employees overnight that

could handle the loading of trucks. Mr. Afek told Ms. Rodriguez how to schedule the employees and why it was necessary. Perez was not responsible for scheduling the warehouse employees, as FBF claims.

79.     Emails filed in the record show that Perez had to ask for permission to change the rate of shipping. The email to Ari Afek shows that he was asking Ari to change the rate in the computer system because Perez was not allowed access to change the rate. On one page of the emails, Perez asks, "Can we move them down to $[X]?" If Perez had been allowed to set the rates, why was he asking for permission to set a rate?

80.     Perez was a "manager" only by title. He did not have the discretion to set shipping prices. For example, in some emails he asks, "Can we move them down to $[X]?"; "Did we ok the rate?"; or states, "Ari or Ronen need rate for new customer below." Perez did not have the authority to hire or fire employees and he did not have access to input the rates into the computer system.

81.     Perez was required to follow the FBF rules and policies, which included reporting incidents where there were delivery issues. Perez was instructed to report these issues to Ari Afek, Ronin Koubi, and Ralph Milman. He was not allowed to make decisions regarding incident(s). Those decisions were made by Mr. Afek, Mr. Koubi, and Mr. Milman.

82.     Perez remembers asking if "Brian" could be hired, but the decision to either hire Brian or to not hire Brian was made by Ari Afek and not Perez.

83.    The decision to "terminate Carlos" was made by Ari Afek, and not Perez. After Mr. Afek told Perez that Carlos would be fired, Perez sent an email to Mr. Afek, asking him who was going to tell Carlos. Perez needed Carlos' last day to be Friday for purposes of the schedule.

84.    Another email shows Perez asking Ari Afek and Effie Kaplan when they were going to hire new people, which demonstrates that Perez did not have the ability to hire new employees.

85.    In another email, Perez asked if "Brian" could be hired. However, the decision to either hire Brian or to not hire Brian was made by Ari Afek and not Perez

86.    The decision to "terminate Carlos" was made by Ari Afek, and not Perez. After Mr. Afek told Perez that Carlos would be fired, Perez sent an email to Mr. Afek, asking him who was going to tell Carlos. Perez needed Carlos' last day to be Friday for purposes of the schedule.

87.    An email shows Perez asking Ari Afek and Effie Kaplan when they are going to hire new people and it demonstrates that Perez did not have the ability to hire new employees.[8]

---

[8]    The Undersigned realizes that paragraphs 82 -84 are repeated in paragraphs 85-87, but that is how they were written in Perez's Additional facts. Presumably, FBF would have spotted that and mentioned it in a Reply Statement of Material Facts.

88.     An email exchange shows that Ari Afek was the person who "let go" of Carlos. Perez reported Carlos' behavior to Mr. Afek, but he did not participate in the decision to terminate Carlos' employment. That decision was made by Mr. Afek. The portion of the email where Perez states, "If not I will let him go," is the same as another email where he was asked Mr. Afek who should let Carlos know.

89.     Based on an email, Perez remembers that Mr. Afek asked him about the schedule after he before he approved it.[9] This email is Perez explaining to Mr. Afek the changes so he would approve it. The second part of the email shows that Mr. Afek was the person who interviewed prospective employees ("strong resume"). Perez did not interview prospective employees, but he did meet several that were introduced to him while he was at work in the office. Perez was not given their resume or their application to review.

90.     On another page in an email, Perez asked Ari Afek to clock in an employee due to a time clock issue. He did not have access to the time keeping system. Only managers had access to the time keeping system.

91.     According to another page in an email filed on this record, Perez was required to follow the FBF rules and policies, which included reporting incidents where

---

[9]     The Undersigned acknowledges that 'before' and "after" are inconsistent, but this is the format Perez used for this paragraph in his additional facts. Had FBF served the required Reply Statement of Material Facts, it could have flagged this inherent inconsistency.

there were delivery issues. Perez was to report these issues to Ari Afek, Ronin Koubi, and Ralph Milman. Perez took pride in his work. When he referred to "we," he meant the company because he felt as if he was a part of the company. He did not have the power to discipline, suspend, or dock the pay of any FBF employees.

92.     As noted on another page of an email filed on the docket, while it was the policy of FBF to require employees to clock in and clock out, which included Perez, he was never disciplined for not clocking in or clocking out (even though he was asked to clock in and out).

93.     On another page in an email, Perez was informed by Ari Afek that if an employed worked through lunch, that employee needed to be paid for the time, and that Perez should share this information with the customer service employees. This email shows that Perez was letting the other employees in the customer service department know what Mr. Afek informed him of this, and that if they work through lunch, they should be paid for their time. Perez did not set this policy; he only repeated what he was told.

94.     Juan Vargas and Hanan both worked as supervisors in the warehouse and were responsible for scheduling their employees. The warehouse employees did not work in the same department as Perez. Juan and Hanan were asked in an email to please schedule more employees on Sunday, so the floral shipments were not delayed. Perez

was following FBF protocol by copying Ari Afek and Ronen Koubi, who made the decision regarding scheduling.

95.     An email shows that it was Ari Afek who had control over the schedules, and he came and spoke with two customer service employees regarding their workdays and overtime hours. This upset the employees because both had been working extremely hard and long hours because Mr. Afek would not hire any additional employees. In the end of the email, he states that the "[s]hortage of personnel and over working myself is one of the reasons in which I gave my resignation." If Perez had been given the responsibility to hire people, he would have hired several more, but he was not allowed. Mr. Afek ignored Perez's requests to hire more customer service employees. If Perez had the ability to schedule employees for overtime, he would have done so, and the employees would have gladly worked and been paid time and a half. However, Mr. Afek was one of the persons who had final say regarding schedules, not Perez.

96.     In an email, Perez asked Ari Afek about a raise he had decided to give to one of the customer service employees. Perez informed Mr. Afek that Yudmila had started working on produce with Javier. Because Yudmila was taking on extra responsibilities, it was decided by Mr. Afek (and Perez agreed with his decision) to give her a raise.

97.     In an email, Perez requested that the raise be made retroactive since she had been taking on the new responsibilities for more than a week, and it was Mr. Afek's decision whether it would be retroactive.

98.     In an email, Ari Afek decided to give Yudmila (Gonzalez) a raise, and Perez was reminding Mr. Afek about his decision.

99.     Several emails show that Perez was following company policy and not making any independent decisions regarding days off or employees coming late/not coming in. He did not set the policies, nor did he make decisions regarding how the policies were going to be enforced or not enforced regarding days off, sick days, or employees coming in late or not at all.

100.    An email regarding Mike Fernandez not coming in shows that Effie is aware of the issue. She needed to be made aware because she was running the office for customer service, not Perez.

101.    It was the policy of FBF that employees who worked in the customer service area let Perez know that they were requesting time off (for various reasons). Perez signed the "Leave of Absence Request" to acknowledge that they were requesting the time off so he could make whatever changes to the schedule that needed to be made. He did not have the authority to grant or deny any of the requests. The authority to grant or deny the request(s) was made by the FBF HR department.

102.    An email shows that Perez was not allowed to make decisions regarding days off without permission from FBF's HR official, Ari Afek.

103.    Other emails show that Perez was doing what he had been instructed to do when problems arose during deliveries; reporting the issues to Ari Afek, Ralph Milman, and Ronen Koubi. He was not in charge of any of the employees at FBF, and he was not in charge of the independent contractors either. However, it was a part of Perez's duties to pass on the customer complaints regarding floral deliveries. Passing on the complaints to the management team was the policy at FBF. Of course, Perez made suggestions on how to solve several issues, but he was not given the authority to make the final decision(s).

104.    An email shows that Perez was following set FBF procedures by notifying Ralph Milman and Ronen Koubi after a customer complained about an incident regarding FBF drivers taking pallets.

105.    In an email from Perez to Ronen Koubi regarding dust in the workspace. Koubi (on the bottom of the page) asked Carlos, "Why the delay?" Perez was only reporting the issue as per FBF set procedures and he did not have the authority to fix the issue; Mr. Koubi was asking Carlos why the issue had not been fixed.

106.    An email shows that Perez was following set FBF procedures by notifying Ralph Milman, Ronen Koubi, Ari Afek, and several others after a customer complained about deliveries. He did not have the authority to dock the drivers' pay so Perez

suggested to Ari Afek and Silvio Chavez that the drivers (independent contractors) not be paid for the stops and for what FBF had to pay the other crew to fix the issue.

107.    An email shows that Perez was passing on the set policies of FBF to the other employees/departments as he was directed to do by Ralph Milman, Ronen Koubi, Effie Kaplan, and Ari Afek. Perez did not set these polices, that was done by the owners of FBF. Perez followed the set policies of FBF, and he did not make policies.

108.    Perez did not direct the work of any other employees at FBF.

## III.    Applicable Legal Principles

### A.  Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the

burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (affirming order denying defendant's summary judgment motion on qualified immunity because of factual issue). And when conflicts arise between the facts evidenced by the parties, courts must "credit the nonmoving party's version." *Id.* at 1252.

If there are any factual issues, then the Court must not decide them; it must deny the summary judgment motion, and the case then proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envt'l. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). The Court cannot weigh conflicting evidence to resolve factual disputes. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (citation omitted) (reversing in part summary judgment).

Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts," summary judgment "may be inappropriate." *Whelan*, 2013 WL 5583970, at *2. *See generally Johnson v. NCL (Bahamas) Ltd.*, No. 16-21762, 2017 WL 1293770, at *2 (S.D. Fla. Feb. 3, 2017) (denying summary judgment motion in passenger's slip and fall lawsuit against cruise ship operator).

Our Circuit does not hesitate to reverse orders improvidently granting summary judgment motions, and has noted that "even if a district court 'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano*, 707 F.3d at 1252 (citing *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).

Moreover, "as a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature." *Feliciano*, 707 F.3d at 1253.

The Undersigned is discussing the significance of a plaintiff's testimony because Perez submitted a declaration (and declarations from former FBF employees). Perez's declaration, of course, can be classified as "self-serving," but that alone is insufficient to ignore it.

First, most, if not all, affidavits are self-serving. That is why they are being filed. A litigant would not typically file an affidavit which supports the opponent's position. Second, a court cannot simply discredit or disbelieve an otherwise adequate affidavit merely because it is self-serving. *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (finding that the "self-serving statements" that a litigant sets forth in an affidavit "can defeat summary judgment" but a conclusory affidavit cannot defeat summary judgment).

If, on the other hand, an affidavit consists solely of conclusory and/or unsupported allegations, then they will not defeat an otherwise sufficient summary judgment motion. *See Alvarez v. City of Miami Beach*, No. 18-CV-22743-UU, 2019 WL 11583396, at *6 (S.D. Fla. Mar. 25, 2019) (citing *Stein*, 881 F.3d at 857) (finding that even though a self-serving, uncorroborated affidavit may, at times, defeat summary judgment, "[a]n affidavit cannot be conclusory"); *see also Wells v. Cramer*, 262 F. App'x 184, 187 (11th Cir. 2008) (citing *Sammons v. Taylor*, 967 F.2d 1533, 1544 n.5 (11th Cir. 1992)) ("Though the facts alleged in an inmate's sworn pleading are sufficient to defeat a motion for summary judgment and a separate affidavit is not necessary, mere conclusions and unsupported factual allegations are legally insufficient to defeat summary judgment.").[10]

---

[10]     FBF is critical of Perez's declaration, but it has not filed a motion to strike it. Even if it had done so, however, it is far from clear that such as motion would have succeeded. *See Meyer v. Carnival Corp.*, No. 12-20321-CIV, 2013 WL 10154313, at *1 (S.D. Fla. Jan. 17, 2013) (denying defendant's motion to strike affidavit of defendant's employee, Jacques, which argued that the affidavit "was manipulated by Plaintiff solely to defeat the entry

## B.  The FLSA Exemptions

### i.  *General Principles*

As highlighted in *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2008), the Eleventh Circuit has recognized the "Supreme Court's admonition that courts closely circumscribe the FLSA's exceptions." *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997). Moreover, an exemption "is to be applied only to those clearly and unmistakably within the terms and spirit of the exemption." *Id.* (citing *Brock v. Norman's Country Market, Inc.*, 835 F.2d 823, 826 (11th Cir. 1988)) (quotation marks omitted). Therefore, the federal courts in our Circuit "narrowly construe exemptions to the FLSA overtime requirement." *Id.* at 1269.

### ii.  *The Administrative Employee Exemption*

The FLSA requires an employer to pay an employee for overtime pay if he or she works more than 40 hours in a week. *See* 29 U.S.C. § 207(a)(1) (2020). The Act, however, exempts from this requirement "any employee employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1).

The Department of Labor ("DOL") has promulgated regulations and guidance that interprets and explains, respectively, this exemption. *See* 29 C.F.R. § 541.200, et seq. (2020);

---

of summary judgment," because the affidavit merely sets forth Jacques' personal knowledge and observations regarding the period of time in which he was employed by Defendant Carnival).

U.S. Dep't of Labor, *Fact Sheet #17c: Exemption for Administrative Employees Under the Fair Labor Standards Act (FLSA)* (Sept. 2019), *available at* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/fs17c_administrative.pdf (hereinafter "Fact Sheet # 17C"). The DOL's regulations state that an employee qualifies as an administrative employee if:

      1.     The employee is compensated on a salary basis at a rate of at least $684 per week;

      2.     The employee's primary duty is the performance of office or non-manual work related to the management or general business operations of the employer or its customers; and

      3.     The employee's primary duty includes the exercise of discretion and independent judgment regarding matters of significance. 29 C.F.R. § 541.200(a) (2020); *see also* 29 C.F.R. §541.2 (2020) ("A job title alone is insufficient . . . the exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part.").

      iii.   *The Executive Employee Exemption*

The FLSA provides for an executive employee exemption that applies to "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1).

The DOL's regulations and guidance on this exemption is similarly outlined in the Code of Federal Regulations and in Fact Sheet # 17B. *See* 29 C.F.R. § 541.100, et seq. (2020); U.S. Dep't of Labor, *Fact Sheet #17B: Exemption for Executive Employees Under the Fair Labor*

*Standards Act (FLSA)* (Sept. 2019), *available at* https://www.dol.gov/
sites/dolgov/files/WHD/legacy/files/fs17b_executive.pdf (hereinafter "Fact Sheet # 17B").
The DOL's regulations state that an employee qualifies as an executive employee if:

1.      The employee is compensated on a salary basis at a rate of at least $684 per
week;

2.      The employee's primary duty is management of the enterprise or a
customarily recognized department or subdivision of the enterprise;

3.      The employee customarily and regularly directs the work of two or more
other employees; and

4.      The employee has the authority to hire or fire other employees or whose
suggestions and recommendations as to the hiring, firing, advancement, promotion or
any other change of status of other employees are given particular weight.

*See* 29 C.F.R. § 541.100(a) (2020).

The Eleventh Circuit has rejected a "categorical approach" to deciding whether an
employee is an exempt executive. *See Morgan*, 551 F.3d at 1269 (affirming jury verdict
finding that Family Dollar failed to meet its burden to prove that store managers were
not exempt executives and noting that managers spent 80 to 90% of their time performing
nonexempt manual labor). Instead, our appellate court has noted the "necessarily fact-
intensive nature of the primary duty inquiry," that "the answer is in the details," and that
"[w]here an issue turns on the particular facts and circumstances of a case, it is not

unusual for there to be **evidence on both sides of the question**, with the result hanging in the balance." *Id.* (emphasis added). And "[t]he result reached must be left intact if there is evidence from which the decision maker, the jury in this instance, reasonably could have resolved the matter the way it did." *Id.*

iv. *The Highly Compensated Employee Exemption*

Under the FLSA, employees that earn at least $107,432 in total annual compensation and perform *any one* or more of the exempt duties of an executive or administrative employee are exempt from the Act. *See* 29 C.F.R. § 541.601 (2020) (emphasis added). Generally, the year for annual compensation purposes is considered the 52-week calendar year, unless otherwise defined by an employer. 29 C.F.R. § 541.601(b)(2) (2020).

**IV.    <u>Analysis</u>**

As an overarching observation, the Undersigned notes that FBF may well be able to demonstrate at trial that Perez is exempt from the FLSA's overtime pay requirements. Perhaps a jury might not deem credible his explanations about why he sent certain emails that could make it appear as though he was exercising management authority or engaging in discretionary decisions. Or maybe a jury would accept his comments about the context in which the emails were drafted. And a jury could accept some of his explanations and reject others. These jury evaluations of Perez's explanations (and of testimony which will presumably be offered by the same former employees who signed

34

declarations to support Perez's opposition to the summary judgment motion) will, naturally, involve conclusions about credibility.

Juries make those types of credibility assessments in every trial; a Court cannot do so in a summary judgment context. *See, e.g., Mandell v. Fulford*, No. 08-61630, 2010 WL 11505544 (S.D. Fla. Feb. 17, 2010) (denying employer's summary judgment motion because of credibility-generated material factual issues concerning purported executive and administrative exemptions under the FLSA); *Partridge v. Mosley Motel of Saint Petersburg, Inc.*, No. 8:15-cv-936, 2016 WL 70705, at *9 (M.D. Fla. Jan. 6, 2016) (denying employer's summary judgment motion in an FLSA case and noting that the court "must avoid weighing conflicting evidence or making credibility determinations on summary judgment"); *Martinez v. Cancun Grill, Inc.*, No. 08-23362, 2009 WL 10667190, at *2 (S.D. Fla. Sept. 3, 2009) (denying employer's summary judgment motion in an FLSA lawsuit, noting that a judge cannot "weigh the credibility of the parties on summary judgment" and emphasizing that "if the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact").

The possibility that Perez is exempt but provided incorrect, skewed, or misleading explanations is not, of course, the issue here. Instead, the issue is whether FBF has demonstrated an absence of genuine material fact on the purported FLSA exemptions. And that answer is "no."

## A. The Administrative Exemption

Perez does not challenge FBF's point that he met the first prong (of being paid more than $684 per week). But he contends that factual disputes prevent FBF from obtaining summary judgment on the second prong (whether his primary duty was management) and the third prong (whether he had discretion and used independent judgment).

Perez points to evidence suggesting that he was a "production" employee whose primary duty was sales, not management. There is record evidence to support Perez's view of his duties. He worked in the sales department and his primary duties were non-physical labor. The "Floral Department" were he worked was not an actual department because it was a subgroup of the "Sales Department." He was the only employee who worked in the Sales Department.

According to Perez, his "manager" title was a title in name only, as he did not have the authority of an actual manager. FBF disagrees, to be sure, but this factual tension is what lawsuits are all about. The Undersigned is not going to completely credit FBF's view of Perez's duties and completely reject Perez's version. To the extent that FBF relies on specific evidence (such as Perez's schedule-writing for employees), Perez has an explanation (such as the point that others had the final decision about approving the schedules). Some of his duties may have been management related, but there is evidence to confirm Perez's interpretation of his duties as primarily production related.

Under these circumstances, the Undersigned cannot safely recommend that Perez be classified as exempt under the administrative exemption because there is a dispute over the second prong. *See Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896 (3d Cir. 1991) (affirming trial court's conclusion that employees were not administrative, noting with approval the trial court's observation that Defendant's business "is the sale of electrical products" and that its "primary business purpose . . . is to produce sales of electrical products" and holding that inside salespersons may be classified as "production" workers); *Schnepf v. Bros. Auto Salvage Yard, Inc.*, No. 1:10-CV-0316-TAB-JMS, 2012 WL 442331, at *4 (S.D. Ind. Feb. 10, 2012) ("In this case, Schnepf's primary job duty was to sell automotive parts to individual customers, which is nonexempt work. Brothers has not satisfied its burden of showing that Schnepf's primary job duty consisted of the performance of office or nonmanual work directly related to management policies or general business operations of his employer."); *Palacios v. Boehringer Ingelheim Pharm., Inc.*, 814 F. Supp. 2d 1357, 1365 (S.D. Fla. 2011) (finding that defendant failed to demonstrate that Plaintiff's role was directly related to the management or general business operations of the employer and noting that Plaintiff "never performed any work in the functional areas of tax, finance, accounting, auditing, advertising, research and development, personnel management, human resources, labor relations, government

relations, or information technology").[11]

Similarly, the Undersigned cannot recommend that Judge Moreno enter summary judgement in FBF's favor for yet another reason: there is a genuine factual dispute over the third prong of the administrative exemption.

29 C.F.R. § 541.202 provides in part:

(a)     To qualify for the administrative exemption, **an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance.** In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term "matters of significance" refers to the level of importance or consequence of the work performed.

(b)     The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. **Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:** whether the employee has authority to **formulate, affect, interpret, or implement management policies or operating practices**; whether the employee carries out **major assignments in conducting the operations of the business**; whether the employee performs **work that affects business operations to a substantial degree**, even if the employee's

---

[11]     29 CFR § 541.201(b) provides that "work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research, safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." FBF has not established that Perez was primarily involved in any of these areas. Indeed, it has not demonstrated that Perez was involved in these areas in any way.

assignments are related to operation of a particular segment of the business; whether **the employee has authority to commit the employer in matters that have significant financial impact**; **whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management**; **whether the employee is involved in planning long or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management**; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

*Id.* (emphasis added).

Using an objective prism to look at whether Perez performed any of the duties set forth in subsection (b) above, the Undersigned finds that the only conclusion is that there is evidence to suggest that he performed a few of the duties but also evidence to suggest that he did not. To the extent that he performed any of the duties, he can point to evidence suggesting that his actions and decisions were subject to review and approval by others in the company or that he was merely carrying out FBF's policies. *See Barnes v. Frameless Shower Doors & Enclosures, Inc.*, No. 14-CIV-62243, 2015 WL 11201195, at *6 (S.D. Fla. May 6, 2015) (denying defendant's motion for summary judgment regarding administrative exemption where material issues of fact existed as to the plaintiff's responsibilities under the third prong of the test); *see also Alvarez v. Key Transp. Serv. Corp.*, 541 F. Supp. 2d 1308, 1313-14 (S.D. Fla. 2008) (noting that "matters of significance" include responsibilities dealing with matters of broad scope and significant detail that have a profound effect on an employer's business," not simply trivial discretionary matters).

## B.      The Executive Exemption

Perez was in fact paid more than $684 per week, so the first prong of the executive

exemption is met. But there is a dispute about second, third, and fourth factors: whether

his primary duty was management; whether he customarily and regularly directed the

work of two or more other employees; and whether he had the authority to hire or fire

other employees, or whether his suggestions or recommendations about the hiring, firing,

advancement, promotion, or other change of status of other employees were given

particular weight.

The Undersigned adopts the earlier discussion and analysis about whether Perez's

primary duty was management, as opposed to sales -- and whether he was an employee

involved in production, as opposed to administration.

In addition, the Undersigned also looks to applicable federal regulations for

additional guidance. Specifically, 29 C.F.R. § 541.102 (management) lists factors to

consider when determining if an employee is primarily involved in management:

> Generally, "management" includes, but is not limited to, activities such as
> interviewing, selecting, and training of employees; setting and adjusting
> their rates of pay and hours of work; directing the work of employees;
> maintaining production or sales records for use in supervision or control;
> appraising employees' productivity and efficiency for the purpose of
> recommending promotions or other changes in status; handling employee
> complaints and grievances; disciplining employees; planning the work;
> determining the techniques to be used; apportioning the work among the
> employees; determining the type of materials, supplies, machinery,
> equipment or tools to be used or merchandise to be bought, stocked and
> sold; controlling the flow and distribution of materials or merchandise and
> supplies; providing for the safety and security of the employees or the

property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*See* 29 C.F.R. § 541.102.

Although there is some evidence in the record to suggest that Perez performed some of the duties listed in the regulation, there is also evidence to suggest otherwise. For example, FBF says that Perez established work schedules, which seems to be in the "setting and adjusting their rates of pay and hours of work" category. But Perez's declaration explains that he did not actually set the hours; he was "instructed" to write schedules for customer support employees and had "very little or no discretion on the number of hours each employee was scheduled to work or the days of the weeks they would work."

In *Morgan v. Family Dollar*, the Court was not swayed by Defendant's position that the plaintiffs were classified as store managers who were "in charge" of the stores because an individual analysis illustrated that the managers had "few, and infrequently exercised, discretionary powers." 551 F.3d at 1271-72. For current purposes (i.e., deciding whether FBF met its burden of establishing the executive exemption in a summary judgment motion context), the Undersigned notes that *Morgan v. Family Dollar* highlighted the existence of "evidence on both sides of the question," which gave the jury authority to resolve the matter in the way it did. *Id.* at 1273.

So the mere fact that Perez may have sometimes referred to himself as a "manager" does not automatically mean that he was a manager and that no other interpretation is factually available.

Concerning the involved-in-management prong, the Undersigned approves and adopts the earlier discussion and recommends that Judge Moreno reject FBF's argument that it adequately proved, without the existence of factual disputes, that Perez was involved in management.

The Undersigned **respectfully recommends** that Judge Moreno **deny** summary judgment in FBF's favor on the executive exemption for another reason: there is a factual dispute over FBF's contention that Perez customarily and regularly directed the work of two or more other employees.

Once again, this analysis turns to an applicable regulation, 29 C.F.R. § 541.70, which provides:

> The phrase "customarily and regularly" means a frequency that must be **greater than occasional** but which, of course, may be less than constant. Tasks or work performed "customarily and regularly" includes work **normally and recurrently performed every workweek;** it does not include isolated or one-time tasks.

(emphasis added).

FBF has submitted some emails in which Perez gave instructions to a few other employees. But a few instructions over a multi-year term may not necessarily be sufficient to reach the required level of "customarily and regularly." When combined with Perez's

declaration (in which he advised that he has not in charge of the employees who worked in sales because all of the other salespeople did not sell floral cubes) and the limited number of emails, there is a factual dispute about Perez's relationship with other employees and whether he customarily and regularly directed them.

FBF has also not established an absence of a factual dispute concerning the final, fourth prong of the test for the executive exemption: whether Perez had authority to hire or fire other employees (or if his suggestions and recommendations were given particular weight).

Perez's declaration asserted several relevant points and they were all made in a forceful, relatively unequivocal way:

Perez did not have the discretion to set schedules without the approval of Ari Afek or Ralph Milman; he did not hire employees and did not have any say in their pay rates, pay raises, and their effective dates and disciplinary review(s); Plaintiff did not hire or interview prospective employees aside from meeting them, therefore, Defendants' assertion that they gave Plaintiff great weight is false; Plaintiff did not recommend firing or transfers out of "Plaintiff's sales department"; Perez followed the FBF policies in reporting days off, employees not coming in, employees being tardy; Perez did not have the authority to give employees a "leave of absence"; Plaintiff drafted the schedule, but the schedule would have to be approved by Ralph Milman or Ari Afek.

As noted, FBF has not properly responded to the statement listed in the preceding

paragraph (which was in Perez's additional facts). But even if FBF had responded by serving a Reply Statement of Material Facts, that would have simply generated a formal and appropriate response demonstrating that the factors surrounding the purported executive exemption are, in fact, disputed. And that would have likewise caused the Undersigned to recommend that FBF's motion be denied on the executive exemption. *See Altman v. Sterling Caterers, Inc.*, 879 F. Supp. 2d 1375, 1383 (S.D. Fla. 2012) (denying motion for summary judgment on executive exemption under FLSA because material issue of fact existed as to whether the plaintiff had the power to hire and fire employees).

### C.    Highly Compensated Employee

Although Perez concedes that he meets the financial prong of the highly compensated employee exemption, FBF has not established for summary judgment purposes that he customarily and regularly performed one of the exempt duties or responsibilities of an executive or administrative employee. As a result, summary judgment in FBF's favor is unavailable. *See Pierce v. Wyndham Vacation Resorts, Inc.*, No. 3:13-CV-641-CCS, 2017 WL 4480199, at *7 (E.D. Tenn. Oct. 6, 2017) (denying employer's summary judgment motion on highly compensated employee exemption because of factual dispute concerning plaintiff's duties).

### V.    <u>Conclusion</u>

The Undersigned **respectfully recommends** that Judge Moreno **deny** FBF's summary judgment motion. Given the differing interpretations of the relevant facts and

FBF's failure to respond to Perez's allegedly undisputed facts, the scenario here "presents a classic swearing match, which is the stuff of which jury trials are made." *Feliciano*, 707 F.3d at 1253 (affirming on interlocutory appeal an order denying police officer's summary judgment motion based on alleged qualified immunity).

This does not mean that Perez was not an exempt employee. Rather, it means only that FBF is not entitled to summary judgment on the exemptions because factual disputes render the requested ruling unavailable. If the case goes to trial, then the jury will be able to assess Perez's credibility and determine whether he or FBF executives are more believable on the exemption factors.

## VI.   <u>Objections</u>

The parties shall have **ten** calendar days from the date of this report to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within **ten** calendar days from the date of the objection.[12] Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report, and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this report, except upon grounds of plain error and if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v.*

---

[12]   The Undersigned is shortening the time in which the parties have to file objections and responses because of the upcoming trial date and because the issues are common ones in FLSA litigation.

*Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir.

R. 3-1 (2016).

   **RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on March

24, 2021.

                _____
                Jonathan Goodman
                UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All Counsel of Record